UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BRIAN JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08-CV-3199 |
| | ) | |
| NURSE L. BUCHANAN, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Plaintiff, proceeding pro se and incarcerated in Stateville

Correctional Center, pursues various claims arising from incidents which

occurred during his incarceration in Western Illinois Correctional Center.

Defendants moved for summary judgment in June, 2012.  The case was

subsequently transferred to this Court in September, 2012.[1]

---

[1]Many of the claims are improperly joined in one action, but since they have proceeded thus far in one action the Court will not sever them at this time.  The court may sever the claims that ultimately survive for purposes of the trial.  Fed. R. Civ. P. 20, 21.

1

On March 29, 2012 the Court entered a text order granting and denying the summary judgment motions. This opinion is the written explanation for that ruling. The remaining Defendants will be directed to file supplemental summary judgment motions in order to ensure that justiciable issues remain for trial.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of

proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. Id.

ANALYSIS[2]

## I.  Motion for Summary Judgment by the Medical Defendants

Plaintiff pursues claims against the following Defendants who are employed by Wexford Health Sources, Inc. ("the Medical Defendants"):

---

[2]The Court looks only to the Amended Complaint to determine the claims Plaintiff pursues. The Amended Complaint replaced all prior complaints in their entirety. Additionally, the Court has considered only the parties' submissions on summary judgment (the motions for summary judgment and Plaintiff's response). The Court has not "scoured the record" in search of factual disputes. Greer v. Board of Education of the City of Chicago, 267 F.3d 723, 727 (7th Cir. 2001)(even in pro se case, "neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes.'")(quoted cite omitted).

Defendants Buchanan, Brown, Ring, Thornton, Ashcraft, Hazelrigg, and Wexford Health Sources, Inc..  Plaintiff does not individually address the Medical Defendants' proposed disputed facts.  For the most part, he reiterates his allegations and attaches exhibits he believes support those allegations.[3]  The Court has accepted Defendants' proposed statement of facts as true, to the extent the facts are material and supported by their cites to the record, and to the extent not disputed by Plaintiff's responses.  CDIL-LR 7.1(D).

The facts show that Plaintiff was transferred to Western Correctional Center in February, 2007.  His medical records reveal that at that time he had "external hemorrhoids and a history of H. Pylori[4]

---

[3]Plaintiff contends that he never received the exhibits in support of the motions for summary judgment.  However, he has no evidence that Defendants failed to send him those exhibits.  Nor did he file a motion to compel the exhibits or ask for another copy of the exhibits from Defendants.

[4]According to Mayo Clinic's website, "H. pylori infection occurs when a type of bacteria called Helicobacter pylori (H. pylori) infects your stomach, usually during childhood. A common cause of peptic ulcers, H. pylori infection is present in about half the people in the world.   Most people don't realize they have H. pylori infection, because they never get sick from it. If you develop signs and symptoms of a peptic ulcer, your doctor will probably test you for H. pylori infection, because it can be treated with antibiotics."  www.mayoclinic.com, "H. Pylori Infection" (last visited April 9, 2012).

with treatment on November of 2006." (Undisputed Fact 7, d/e 123).

Dr. Brown saw Plaintiff on April 23, 2007 for "complaints of headaches, perineal pain, and rectal bleeding." (Undisputed Fact 10, d/e 123). Dr. Brown diagnosed a lower gastrointestinal bleed, prescribed Hytrin, Tylenol, and Afrin, and scheduled Plaintiff for a follow-up appointment in two weeks. Id.

On May 7, 2007 Dr. Brown saw Plaintiff and ordered a "complete blood count, an H. Pylori test, Metamucil and Afrin." (Undisputed Fact 11, d/e 123). When the H. Pylori test came back positive, Dr. Brown ordered a "rapid treatment regime," which the Court presumes is a regimen of antibiotics. (Undisputed Fact 12, d/e 123). On May 29, 2007, Dr. Brown determined that the treatment had not worked. He prescribed Metamucil, Disalcid, and Bentyl and discussed Plaintiff's case with Dr. Hermens, a gastroenterologist at the Quincy Medical Group. Dr. Hermens explained to Dr. Brown that H. Pylori infections are "notoriously slow to react." (Undisputed Fact 14, d/e 123).

On July 30, 2007 Plaintiff saw Dr. Hermens, who noted that

Plaintiff "complained of right lower quadrant abdominal pain, constipation and rectal bleeding." (Undisputed Fact 16, d/e 123). Dr. Hermens recommended upper and lower endoscopies, which were performed on September 7, 2007. Dr. Brown saw Plaintiff in a follow-up visit on September 10, 2007 and noted that Plaintiff's colon test had been negative, that Plaintiff had pre-pyloric gastritis, and that the H. Pylori test was pending. Dr. Brown diagnosed Plaintiff with gastritis and migraines and prescribed Zantac, Prilosec, Maalox, and Tylenol. (Undisputed Fact 22, d/e 123).

According to the medical records, Plaintiff saw someone about a lump in his calf on November 30, 2007. The notes state that a pea-sized lump was felt. The plan was to refer Plaintiff to "NSC if painful or increase in size." (d/e 123-2, p. 8). The Court presumes that "NSC" means nurse sick call. Plaintiff signed a refusal to go to sick call about his calf on December 7, 2007. (Plaintiff's Dep. p. 77). Plaintiff testified that he was forced to sign the refusal or go to segregation, but he does not explain this. Id. He also seems to assert that he never refused to go

to sick call, but he does not explain the contradiction in his deposition. Pourghoraishi v. Flying J., Inc., 449 F.3d 751, 759 (7th Cir. 2006)(affidavit contradicting earlier deposition should be disregarded).

Medical records from February 10, March 5, and March 10, 2008 indicate that Plaintiff refused to see the nurses or the physician's assistant and had refused to sign the refusal form. (d/e 123-2, p. 14). However, Plaintiff testified in his deposition that he never refused this medical treatment. (Plaintiff's Dep. p. 71). On May 5, 2008, Plaintiff reported pain and bleeding in his stool.

According to Plaintiff's deposition, he was late to the medicine line on January 30, 2008 because his cell door was broken. Nurse Thornton, Nurse Ashcraft, or some other nurse refused to give Plaintiff his medicine. Plaintiff does not recall what medicine he was supposed to receive, and the parties have not illuminated the record. (Plaintiff's Dep. pp. 152-154). Plaintiff filed a grievance about this incident, claiming that the nurse had said, "n—, get the f— away from the window." (140-8, p. 7).

Plaintiff further testified in his deposition that on March 11, 2008 he was made to wait four hours at the nurses' station to see Dr. Brown,[5] while other inmates who came after him received treatment. According to Plaintiff, one of the nurses said, "'That n— can sit there [sic] all day. He can wait until we get ready to see him. That's what he get for writing us up.'" (Plaintiff's Dep. p. 159).[6] Plaintiff eventually did get to see Dr. Brown that day. Plaintiff wrote a grievance about this incident, but whether a response was given is not clear. (d/e 140-8, p. 1). Plaintiff also maintained in his deposition that unidentified nurses refused to give him unspecified medicine on March 15, 2007 and May 24, 2007. (Plaintiff's Dep. p. 176).

On June 28, 2008 Plaintiff declared his fourth hunger strike but ended the strike later that morning. (Undisputed Fact 28, d/e 123). He was transferred to Menard Correctional Center on July 30, 2008. (Undisputed Fact 28, d/e 123).

---

[5]Plaintiff stated four hours in his deposition and eight hours in his affidavit (d/e 140, p. 10).

[6]According to the Amended Complaint, Nurse Hazelrigg made this remark.

## A. Dr. Brown.

Plaintiff alleges in his Amended Complaint that, in November 2007, Plaintiff complained to Defendant Dr. Brown about "bleeding from my stomach and that I had extreme pain in private areas. I also explained I had a large knot inside my left leg calf." (Amended Complaint, p. 3, d/e 48). Dr. Brown allegedly did nothing, either because he is "known to be senile" or because he intentionally ignored Plaintiff's complaints.

However, Plaintiff's evidence does not support these allegations. As set forth above, Plaintiff was seen by the medical staff for complaints about a lump in his calf of November 30, 2007 and the plan was to refer Plaintiff to nurse sick call if the lump became painful or increased in size. (d/e 123-2, p. 8). No evidence suggests that Plaintiff had a serious medical need in November 2007 that went unattended. Further, Plaintiff admits that at least on one occasion he refused to see the nurses about this problem. There is no evidence that Dr. Brown knew that Plaintiff was suffering from a serious medical need regarding his leg or

refused to treat the problem. At most, the evidence shows that the nurses did not think it necessary to refer Plaintiff to Dr. Brown unless the problem persisted, and Plaintiff disagreed with that decision.[7] There is no evidence that the nurses' assessment was incorrect, much less deliberately indifferent. There is also no evidence regarding what treatment should have or could have been given.

As for Plaintiff's intestinal problems, Dr. Brown did know about these problems and was attentive to them, referring Plaintiff to an outside consultant for tests and following that consultant's recommendations. Plaintiff argues that he could have been spared unnecessary pain and bleeding, but he does not explain what more Dr. Brown could have done.[8] Plaintiff also contends that Dr. Brown delayed treatment, but no delay is evident from the record. Dr. Brown began

---

[7]A purported letter addressed to the nurses states that Plaintiff wanted to see the doctor, not the nurses, because of the nurses' unprofessional attitudes. (d/e 140-4, p. 30).

[8]Plaintiff asserts that he is still losing blood and having pain with bowel movements, even though he has had four operations. (d/e 139, p. 6). However, this case involves only events that occurred at Western Illinois Correctional Center. Plaintiff was transferred out of Western in July 2008.

trying to treat Plaintiff's ailments from the first appointment in April

2007 and referred Plaintiff to a specialist just a few months later.

In sum, Plaintiff's response offers no evidence that Dr. Brown was

deliberately indifferent to Plaintiff's serious medical needs in violation of

Plaintiff's Eighth Amendment rights. There being no apparent adverse

action taken by Dr. Brown against Plaintiff, Plaintiff's retaliation claim

necessarily fails as well.[9] [10]

## B. Nurse Buchanan

Plaintiff alleges in his Amended Complaint that Defendant

Buchanan (the Director of Nursing) refused to put Plaintiff on the list to

see a doctor on December 3, 2007, January 23, 2008, and February 11,

---

[9]Judge Harold A. Baker granted summary judgment on similar claims against Dr. Brown in another of Plaintiff's cases, <u>Jones v. Ruiz</u>, 08-3258 (C.D. Ill)(concluding that Plaintiff had not exhausted his administrative remedies against Dr. Brown or Nurse Still, and, in any event, that Dr. Brown and Nurse Still were not deliberately indifferent to Plaintiff's serious medical needs). However, this case appears to involve a slightly different time frame.

[10]In his response to the summary judgment motion, Plaintiff avers that Dr. Brown and Defendant Fuqua ignored his pleas for medical attention which resulted in him being rushed to the hospital with a fever of 108 degrees. (d/e 140, p. 3). These new allegations are not a part of the case, nor does Plaintiff point to any evidence to support this claim. Plaintiff's affidavit contains additional allegations involving events which are not a part of this case. The Court does not address those additional allegations.

2008.   She allegedly retaliated against Plaintiff for trying to "go over her head" to see a doctor by directing the other nurses to retaliate against Plaintiff.

These allegations remain unsupported by evidence.   The record shows that Nurse Buchanan instructed Plaintiff to "follow procedure and sign up for Nurse Sick Call in your housing unit."  (d/e 140-4, p. 35). No reasonable inference arises that Plaintiff was suffering from a serious medical need for which he should have been allowed to bypass Nurse Sick Call.  Plaintiff was already being treated by Dr. Brown for his intestinal problems, and he has no evidence that the watch-and-wait approach for his calf problem was a substantial departure from accepted professional standards.  <u>Roe v. Elyea</u>, 631 F.3d 843, 858 (7th Cir. 2010)( "'A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a

judgment.'")(quoted cite omitted).

Nor is there any evidence that requiring Plaintiff to follow the nurse sick call procedure was in retaliation for any of his grievances. No evidence suggests that Nurse Buchanan directed the other nurses to retaliate against Plaintiff. Because Plaintiff's allegations against Nurse Buchanan lack evidentiary support, summary judgment is mandated for Buchanan.

### C. Nurses Ring, Thornton, Ashcraft, and Hazelrigg

Plaintiff alleges in his Amended Complaint that these nurses denied him prescribed medication and access to a doctor and called him racial slurs. He further alleges that these nurses took these actions in retaliation for Plaintiff's prior grievances against them. (Amended Complaint, d/e 48, p. 3).

Plaintiff's allegations about being denied prescribed medication are not well developed. The dates of these denials appear to be January 30, 2008, as well as March 15, 2007 and May 24, 2007. However, Plaintiff does not identify the medicines that were denied him on any of these

occasions. The Court does not see any prescribed medicines in the medical records for March 15, 2007, except for Plaintiff's inhaler for his mild asthma, which appeared to be well-controlled, and Plaintiff does not contend that he was denied his inhaler. (d/e 12-3, pp. 20-23). In sum, the Court sees no evidence that Plaintiff was denied medications on March 15, 2007 because Plaintiff does not appear to have been prescribed medicines on that date.

Plaintiff filed a grievance on 5/24/07 about the denial of prescribed medicines by Defendant Nurse Hazelrigg and Defendant Officer Bradbury. (d/e 140-10, p. 2). Plaintiff had been prescribed medicines in April, 2007 for migraines and rectal bleeding (d/e 123-1, p. 26), but whether these were the medicines denied is not stated. Plaintiff does not appear to know what medicine he was denied. A response to the grievance indicates that the prescription for two of Plaintiff's prescribed medicines (Hytrin and Tylenol) had run out on May 23, 2007 and had not been renewed by May 24. (d/e 140-12, p. 3). If that is true, no deliberate indifference occurred. However, the Court cannot accept the

grievance response as evidence of the truth of the matter asserted. The nurses provide no affidavits. Accordingly, this claim will remain in for further development.

The next denial of medication allegedly occurred on January 30, 2008. According to Plaintiff's grievance about the incident, an unidentified nurse at med-line refused to give him his medication, claiming that she did not have to follow the doctor's orders. (d/e 140-8, p. 7). This nurse then allegedly called Plaintiff a racial slur and told him to "get the f— away from the window," sentiments purportedly echoed by officers at the scene. The response to the grievance states that the nurse denied the allegations and maintained that she had told Plaintiff to come back during med line. No affidavits from the nurses are offered regarding this incident either.

In sum, the Court does not have enough information to decide whether the purported May 24, 2007 and January 30, 2008 denials of medication might amount to deliberate indifference to any of Plaintiff's

serious medical needs.[11]  These claims will remain in for further

development.

Additionally, at this point Plaintiff's retaliation claims against these

nurses will survive summary judgment.  Discerning exactly what

grievances or protected First Amendment activity sparked which alleged

retaliation is difficult.  Plaintiff does not point to specific grievances

which he believes sparked specific retaliatory conduct.  Simply attaching

all grievances filed over a period of time and labeling every adverse action

retaliation for those grievances is not enough.  Many of the grievances

were filed *after* an adverse action by one defendant, and Plaintiff makes

no plausible connection between that grievance and later retaliatory

action by a different defendant.  Additionally, many of the grievances

were against correctional officers having nothing to do with the nurses or

with Plaintiff's medical care.

The Court has been able to identify some grievances in Plaintiff's

response that might plausibly be relevant to his retaliation claims against

---

[11]Plaintiff's response contains no competent, admissible evidence to suggest
that these two denials were in retaliation for any protected First Amendment activity.

these nurses.  Plaintiff filed a grievance on 12/03/07 against Defendant Buchanan and other nurses for refusing to treat a painful knot in Plaintiff's leg. (d/e 140-9, p. 11).[12]  Another grievance dated 12/17/07 complains about the nurses' interpersonal skills and questions their ability to "play doctor." (d/e 140-8, p. 11).  A grievance dated 12/26/07 asks to be seen by a doctor besides Dr. Brown and accuses the nurses of refusing to refer Plaintiff to the doctor for his purported internal bleeding.  (d/e 140-12, p. 8).  A grievance dated 1/12/08 claims that Dr. Brown was senile and the nurses either would not or could not treat him. (d/e 140-9, p. 8).[13]  Another grievance dated 1/23/08 accuses Defendant Nurse Buchanan and another nurse of improperly charging Plaintiff for prescribed medicine and threatening him with segregation (d/e 140-8, pp. 22-23).  Additionally, he filed a grievance against the nurses on 1/30/08 regarding the refused medication and another on 2/28/08 about his calf.

On this record, these grievances could have been a possible catalyst

---

[12]The grievance response states that Plaintiff refused to see a doctor on 12/7/07, but Plaintiff denies this.

[13]The response to this grievance states that Plaintiff had refused to attend medical appointments, but Plaintiff denies this.

for the alleged retaliation by nurses on March 11, 2008. On that date, Plaintiff was allegedly intentionally kept waiting to see Dr. Brown for at least four hours. Plaintiff asserts that one of the nurses remarked essentially that the Plaintiff could wait all day because of the grievances he filed and his reports to Wexford. While being forced to wait for a doctor does not alone violate the Constitution, the wait might be a sufficiently adverse action to support a retaliation claim. *See* Bridges v. Gilbert, 557 F.3d 541, 550 (7th Cir. 2009)(adverse action not unconstitutional in and of itself becomes unconstitutional if done in retaliation for the exercise of a constitutional right, provided the action would deter person of "ordinary firmness" from exercising right in future); Babcock v. White, 102 F.3d 267, 276 (7th Cir. 1996)("The federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, . . . as well as the right to be free from retaliation for exercising this right.").

Plaintiff alleges other retaliatory acts as well. He alleges that Nurse Ashcraft told her husband to put Plaintiff in segregation for filing

grievances against her, wrote a false disciplinary report against Plaintiff, and "forced" Plaintiff to sign medical co-payment vouchers. (Amended Complaint, d/e 48, p. 4). Being required to co-pay for medical care is not a retaliatory act. However, the false ticket and segregation might rise to actionable retaliation. The Court does not have enough information to determine whether this claim survives summary judgment. The Court cannot tell the date this occurred or the disciplinary report at issue. Plaintiff also alleges that Nurse Hazelrigg wrote false disciplinary reports in retaliation for his grievances, but the Court has no further information on those allegations. (Amended Complaint, d/e 48, p. 4). Plaintiff needs to identify the disciplinary reports at issue, and the nurses need to submit affidavits. Thus, at this point the retaliation claim will remain in against all the nurses except for Nurse Buchanan. The Court sees nothing to suggest that Nurse Buchanan was personally involved in or directed the retaliation.

Plaintiff also pursues an equal protection claim in regards to these incidents based on the alleged racially derogatory names he was called.

"[R]acially derogatory language, while unprofessional and deplorable, does not violate the Constitution. . . [citations omitted]. Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." Dewalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000)(citations omitted). Racially derogatory language is evidence of racial animus, however, and thus can be used to prove an element of an equal protection claim. Id. at 612 n.3. Though the inference is weak, at this point the Court cannot rule out an equal protection claim based on the denials of medicine on May 24, 2007 and January 30, 2008, and the wait room incident on March 11, 2008. Further development of the record may show otherwise.

## C. Defendant Wexford Health Sources, Inc. ("Wexford")

Plaintiff alleges that Wexford engaged in a conspiracy to cover up the constitutional violations of the nurses and Dr. Brown. The Court has concluded that Nurse Buchanan and Dr. Brown did not violate Plaintiff's constitutional rights, so Plaintiff's claim against Wexford necessarily fails

as it relates to Dr. Brown and Nurse Buchanan.  <u>Sallenger v. City of Springfield</u>, 630 F.3d 499, 504 (7th Cir. 2010)("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.").

As to the conduct of the remaining nurses, Plaintiff's allegations are too conclusory to state a claim against Wexford.  *See* <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949-50 (2009)("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Wexford cannot be liable simply because it employs the medical staff at Western.  <u>Iskander v. Village of Forest Park</u>, 690 F.2d 126, 128 (7th Cir. 1982)(no 42 U.S.C. § 1983 respondeat superior liability for municipality or private corporation); <u>Jackson v. Ill. Medi-Car, Inc.</u>, 300 F.3d 760, 766 n. 6 (7th Cir. 2002)(private corporations acting under color of state law are treated as municipalities for purposes of 42 U.S.C. § 1983).  To state a claim against Wexford, Plaintiff must allege enough  facts (not conclusions) to allow a plausible inference that Wexford "'maintain[ed] a policy that sanction[ed] the maintenance of

prison conditions that infring[ed] upon the constitutional rights of the prisoners.'" <u>Woodward v. Correctional Medical Services</u>, 368 F.3d 917, 927 (7th Cir. 2004). No such factual allegations are offered, much less evidence. Wexford is therefore entitled to summary judgment.

## II. Motion for Summary Judgment by the IDOC Defendants

Plaintiff challenges a hodge podge of unrelated adverse events taken by 29 IDOC Defendants during his incarceration in Western Illinois Correctional Center. These Defendants are: Ashby, Ashcraft, Barfield, Bolton, Bradbury, Brooks, Chute, Cosgrove, Cowick, Davis, Fuqua, Gilson, Goins, Hamilton, Hapke, Holler, Jennings, Korte, Olson, Patterson, Pritchard, Redshaw, Sidwell, Sievers, Skiles, Smith, Sweetin, Wade, and Walls. The Court will address each Defendant in turn.

### A. Defendant Fuqua

Defendant Fuqua is the health care unit administrator at Western Illinois Correctional Center. Plaintiff alleges that Fuqua ignored his requests for medical treatment, refused to place him on the sick call, and disregarded his complaints about misconduct by the nurses. (Amended

Complaint, d/e 48, p. 3).

However, as discussed above, no rational juror could find that Plaintiff had a serious medical need which was not already receiving medical attention. His medical records demonstrate that he regularly saw medical professionals and received medical treatment. Plaintiff did not have confidence in the nurses, but there is no indication that requiring him to follow standard procedures amounted to deliberate indifference to his medical needs. Plaintiff also points to no evidence which might allow an inference that Fuqua took any action against him in retaliation for his grievances. His claim against Fuqua remains at the allegation stage. Accordingly, summary judgment will be granted in favor of Defendant Fuqua.

## B. Defendants Olson, Hamilton and Skiles

Plaintiff alleges that on numerous occasions Defendants Olson, Hamilton, and Skiles refused to allow him to use the restroom near the law library while he was attending the law library. Plaintiff testified that he believed the Warden was the one who instituted a policy prohibiting

inmates from using the restroom near the library. Plaintiff alleges that he was forced to go to the bathroom on himself at least five times, and that white inmates were allowed to use the restroom. (Amended Complaint, d/e 48, p. 5; Plaintiff's Dep., d/e 140, p. 13). He alleges that Defendants Hamilton and Skiles called him racially derogatory names and told Plaintiff that he would be able to use the restroom if he were white. Id. He further avers that these Defendants threatened to revoke his library privileges if he did not stop asking about the bathroom. He maintains that they warned Plaintiff he would be written a false disciplinary ticket for "inciting a riot" if he continued to complain about the restroom policy in front of other inmates.

Plaintiff points to no evidence that the bathroom policy was enforced in a discriminatory manner. He acknowledged that both black and white inmates who worked in the library were allowed to use the library restroom, as well as black and white inmates attending school. (Undisputed Fact 23). He testified that some other white inmates were allowed to use the library restroom, but he does not identify these

inmates and has no personal knowledge of the circumstances under which these inmates were purportedly allowed an exception. (Plaintiff's Dep. p. 105, d/e 121-1).

Remaining is Plaintiff's claim that the bathroom policy constituted cruel and unusual punishment in light of his medical condition or effectively deprived him of access to the library because of his medical condition. Plaintiff does not dispute that his time spent in the library did not exceed two hours and that he could choose to leave the library and go back to his cell to use the restroom. (Undisputed Facts 19-20, d/e 121). However, he testified that he has to urinate frequently, about every 20 minutes. (Plaintiff's Dep. p. 108, d/e 121-1). He also testified that he experiences pain and internal bleeding when holding back bowel movements. He testified that if he left the library to go back to his cell to use the restroom, he would not be permitted to return to the library that day.

There is no indication that these Defendants were responsible for the bathroom policy or were authorized to make an exception to that

policy absent direction from a higher authority. In order for these Defendants to be liable, they must have personally known that denying Plaintiff use of the library bathroom put him at a substantial risk of serious harm or pain or effectively deprived Plaintiff of the use of the library. They also must have had the authority to make an exception to the policy. Defendants offer no affidavits about this claim, and the Court cannot make assumptions in Defendants' favor. Thus, this claim will remain in for further development of the record.

## C. Defendant Annette Cowick

Plaintiff alleges that Annette Cowick had Plaintiff placed in segregation on March 29, 2007 on false charges of threats to staff, in retaliation for Plaintiff's grievances. She also allegedly called Plaintiff racially derogatory names and threatened to put him in segregation again if he continued to file grievances.

Plaintiff's exhibits show that on March 28, 2007 Defendant Cowick wrote Plaintiff a disciplinary report for threatening to sue her if his requests were not timely honored. (d/e 121-2, p. 6). Officers Kunkel and

Ruiz approved Plaintiff's placement in temporary confinement. On March 30, 2007 the Adjustment Committee recommended expungement of the charges because the perceived threats had been made in grievances filed by Plaintiff. (d/e 121-2, p. 9).

At this point, the Court cannot rule out a retaliation claim based on this incident. Defendant seems to contend that she wrote the ticket because of "veiled threats" by Plaintiff and that she wrote the ticket at the direction of internal affairs. However, she submits no affidavit and does not identify what these threats were. The expungement indicates that the perceived threats were made in a grievance, suggesting that Plaintiff's statements may have been protected First Amendment speech. Defendants Ashby, Davis, and Walls will also remain in on this claim because they were involved in disciplining Plaintiff for the ticket.

### D. Defendant Tara Goins

Plaintiff alleges that Defendant Goins violated his constitutional rights by denying all of his grievances and failing to properly investigate those grievances. However, Plaintiff has no federal constitutional right to

a grievance procedure.  *See* <u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1430

(7th Cir. 1996)("a state's inmate grievance procedures do not give rise to

a liberty interest protected by the Due Process Clause.").  Therefore,

Goins' alleged failure to properly handle Plaintiff's grievances does not

state a claim.

### E.  Defendants Redshaw and Chute

Redshaw and Chute allegedly refused to leave the room when

Plaintiff was talking to his criminal lawyer on the phone on about three

occasions.  (Amended Complaint, p. 6, d/e 48; Plaintiff's Dep. p. 124-

25).  Plaintiff alleges that Redshaw and Chute took notes on their

computer while Plaintiff talked to his criminal lawyer and refused

Plaintiff's requests that they leave the room.[14]

Defendants contend that Plaintiff has no Fourth Amendment right

to a private phone call with his criminal attorney, *citing* <u>U.S. v. Sababu</u>,

891 F.2d 1308, 1329-30 (7th Cir. 1989).  However, that case does not

_____

[14]Plaintiff also testified that these Defendants were present while Plaintiff was participating in a phone conference with his attorney and with a judge.  Plaintiff has no right to confidentiality in a court conference that is of public record.

deal with phone calls between an inmate and his criminal attorney. Defendants' argument that <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994) bars this claim also misses the mark. They have not explained how their intrusion on the phone call could imply the invalidity of Plaintiff's conviction.

Both Plaintiff and his attorney knew that their conversation was not confidential because they knew that Defendants refused to leave the room. They thus had no reasonable expectation of privacy. However, Defendants do not address whether Plaintiff and his criminal defense attorney had a right to communicate confidentially grounded in the First Amendment. *See* <u>Czapiewski v. Bartow</u>, 2008 WL 5262801 (W.D. Wis., Judge Crabb)(unpublished)(refusing to allow inmate to take private call from attorney in prison employee's office survived <u>Turner</u> First Amendment analysis; inmate was allowed to have private phone calls with attorney by following procedure); <u>Tucker v. Randall</u>, 948 F.2d 388, (7th Cir. 1991)("[U]nreasonable restrictions on prisoner's telephone access may also violate the First and Fourteenth Amendments.").

Plaintiff may have had alternate means to speaking with his attorney privately on the phone, but not enough information is offered to make that determination. *See* d/e 140-10, p. 17 (response to plaintiff's grievance stating that Plaintiff could call his attorney collect on an unmonitored line); d/e 140-12, p. 20 (ARB concluded that Western's policy was to permit private phone calls with attorneys–Warden to remind staff). Thus, this claim will remain in for further development.

### F. Defendant Sidwell

Plaintiff alleges that Defendant Sidwell denied him recreation time on March 16, 2007, calling Plaintiff racially derogatory names and telling Plaintiff to get his "monkey ass" back to his cell. Defendant Sidwell also allegedly denied Plaintiff food on numerous occasions. (Amended Complaint, d/e 48, p. 7).

Plaintiff testified in his deposition that he believed Defendant Sidwell "was the officer that snatched me out of the line because I didn't have an ID on and I had cornrows in my hair. He said I couldn't go–I couldn't go to the gym and he wouldn't–one time–a couple of times he

wouldn't let me go to chow." (Plaintiff's Dep. p. 130-32). Plaintiff also testified that Sidwell pulled him out of the chow line on about three occasions remarking that Plaintiff had "gang signs" in his hair. (Plaintiff's Dep. p. 129, 132). Sidwell's given reasons for pulling Plaintiff out of the chow line included Plaintiff not having his ID or having his shirt out of his pants. Id. On these occasions, Plaintiff missed the meal completely.

These incidents are not serious enough deprivations to amount to Eighth Amendment violations, but the Court cannot rule out an equal protection claim against Defendant Sidwell on this record. Plaintiff's testimony suggests that Sidwell removed Plaintiff from the chow or gym lines based on Plaintiff's race (because of the style of Plaintiff's hair), though this is not entirely clear since Plaintiff also seems to admit that he did not have his ID and/or his shirt was not tucked in his pants. Sidwell provides no affidavit, making it impossible for the Court to go any further in the analysis of this claim. A more developed record is necessary.

## G.  Defendant Cosgrove

Cosgrove allegedly denied Plaintiff meals, called Plaintiff racially derogatory names, refused Plaintiff medical care, and threatened to put Plaintiff in segregation if Plaintiff did not stop grieving the meals he had missed.  (Amended Complaint, p. 7, d/e 48).

Plaintiff testified in his deposition that Defendant Cosgrove pulled Plaintiff from the chow line a "few times because of my hair"—he don't take no white guys out of the line.  But the white guys have braids, too, but he only take the black guys with the cornrows, him and his buddy." (Plaintiff's Dep. p. 136).  Plaintiff avers in his affidavit that Cosgrove told him "you n— going to learn not to come into my chow line with braids."  (Plaintiff's Dep. p. 7).  Plaintiff filed a grievance against Defendant Cosgrove on December 29, 2007 accusing Cosgrove of refusing to let Plaintiff out of his cell to eat and refusing to get a food tray for Plaintiff.  (d/e 140-6, p. 1).

Like the claim against Defendant Sidwell, the Court cannot rule out an equal protection claim against Cosgrove at this time.  However,

Plaintiff points to no evidence that Defendant Cosgrove denied Plaintiff any medical care. Additionally, Cosgrove's alleged verbal threat to put Plaintiff in segregation if he did not stop filing grievances is not enough by itself to amount to a retaliation claim. <u>Bridges v. Gilbert</u>, 557 F.3d 541, 546, 553 (7th Cir. 2009)(Plaintiff must suffer deprivation "that would likely deter First Amendment activity in the future" and would deter "'a person of ordinary firmness'" of exercising that right)(quoted cited omitted).

### H. Defendant Brooks

Defendant Brooks allegedly pulled Plaintiff from the chow line on one occasion because Plaintiff was wearing a gray sweatshirt under his blue shirt, which is apparently against the rules. Brooks allegedly told Plaintiff to take his "black monkey ass" back to the cell and then saluted Plaintiff like Hitler. Brooks also allegedly "forcibly dragged Plaintiff to his cell without feeding Plaintiff" and refused Plaintiff's requests to be taken to the medical unit. (Amended Complaint, p. 7, d/e 48).

Plaintiff testified in his deposition that Defendant Brooks "dragged

me up the stairs; he physically dragged me up the stairs so he actually abused me, you know what I'm saying?  And then he threw me up in the cell because I was trying to pull away from him and he kept pulling me up and I fell on the stairs a couple of times and I hurt my shins, you know.  He didn't hit me or punch me or nothing though."  (Plaintiff's Dep., p. 142).  In his affidavit, Plaintiff states that Brooks dragged Plaintiff up the stairs and slammed Plaintiff's face into the cell door and steel bunk.  (d/e 140, p. 6).  Plaintiff asked Brooks to take him to the medical unit because his legs hurt and his stomach hurt from not eating, but, according to Plaintiff, Brooks refused.

Brooks does not offer any affidavit about this incident.  Even if he did, determining the amount of force used and the necessity for the force may not be possible without making an impermissible credibility determination.  Accordingly, summary judgment will be denied for Brooks.[15]

---

[15]Plaintiff does not appear to have mentioned the alleged excessive force in his grievance about the chow line incident, but Defendant Brooks does not move to dismiss on exhaustion grounds.  (d/e 140-11, pp. 3-5).

## I. Defendants Korte, Jennings, and Lieutenant Ashcraft

These Defendants allegedly work in internal affairs. According to Plaintiff's Amended Complaint, these defendants allegedly put Plaintiff in segregation on false charges, denied him medical treatment, and threatened to keep putting Plaintiff in segregation until he dismissed pending grievances and stopped filing grievances, particularly on Defendant Nurse Ashcraft, Lieutenant Ashcraft's wife. (Amended Complaint, p. 7, d/e 48). These Defendants also allegedly "choked" Plaintiff. Id. However, Plaintiff stated in his deposition that he was threatened with choking by Defendant Jennings if he did not stop filing grievances, not that he was actually choked. (Plaintiff's Dep. p. 147).

Plaintiff testified in his deposition that Defendant Korte forced Plaintiff to sign papers dismissing Plaintiff's grievances against Brooks and Cosgrove.[16] Plaintiff alleges that he had stated in those grievances

---

[16]The Court cannot tell which grievance(s) Plaintiff dismissed against Cosgrove. Plaintiff was reported as dismissing a grievance dated March 14, 2008 regarding a mail tampering complaint, but that grievance was not against Cosgrove. (d/e 140-5, p. 17). Plaintiff claimed he feared for his life in other grievances based on staff misconduct, but none of those grievances appears to have been dismissed. For example, he filed a grievance about the denial of medicine on 5/24/07 in which he stated he feared for his life. (d/e 140-10, p. 2). A grievance against Cosgrove dated

that he feared for his life.  Based on that statement, these Defendants purportedly told Plaintiff that they would have to put him in segregation for his own protection unless Plaintiff signed a document dismissing his allegations.  (Plaintiff's Dep. p. 146).

Plaintiff included in his response a grievance written against Defendant Brooks about the sweatshirt incident.  (d/e 140-11, pp. 3-5). The response indicates that Plaintiff had voluntarily dismissed the grievance.  Plaintiff maintains that he dismissed the grievance only because he was threatened with being written up on false charges. Plaintiff also withdrew the 5/24/07 grievance about the denial of medication (d/e 140-12, p. 3), but again he asserts that he did so only because he was threatened with segregation.

---

12/29/07 involves the denial of chow, but that was not dismissed.  In a grievance against Defendants Fuqua and Pritchard dated 7/14/08 (d/e 140-5, pp. 3-5), Plaintiff states that he fears for his life based on alleged racial slurs by Fuqua and Pritchard, but he did not dismiss that grievance.   Plaintiff also stated he feared for his life in a 2/22/08 grievance against Defendants Jennings and Ashcraft, based on the alleged false ticket for gang activity. (d/e 140-6, p. 16).  He also said he feared for his life in a grievance dated March 16, 2007 after being ordered by Defendant Sidwell to go back to his cell for talking during line movement to gym.  (d/e 140-7, pp. 20-22).  He also stated he feared for his life in his 1/30/08 grievance about the denial of medication and racial comments by the nurses (d/e 140-8, p. 14), but the Court sees no dismissal of that grievance either.

Plaintiff has no claim against these Defendants because they told him he would be put in segregation for his own safety since he asserted that he feared for his safety. Segregating an inmate is a legitimate response to threats to an inmate's safety. Plaintiff apparently believes that some other response was called for, such as a transfer to a different prison. Substantial deference is afforded prison administrators to determine whether segregation for an inmate's safety is necessary. Further, Plaintiff was not prevented from pursuing his grievances. He could have continued to pursue those grievances from segregation and could have filed a grievance about the segregation if he felt that the segregation was retaliatory rather than for his own safety.

Plaintiff believes that Jennings and Lieutenant Ashcraft embarked on a retaliatory drive against him, filing false tickets and directing others like Defendant Korte to file false tickets. However, the Court sees only one relevant disciplinary ticket in Plaintiff's response. Defendant Jennings wrote Plaintiff a ticket on February 22, 2008, accusing Plaintiff of abuse of privileges and gang activity. (d/e 140-2, p. 25). This ticket

arose when the mailroom intercepted mail from Plaintiff to his brother at Tamms Correctional Center containing the obituary of an ex-gang member and friend. Adjustment Committee members Defendants Davis and Ashby found Plaintiff guilty and recommended three months of grade demotion, six months of contact visit restriction, and destruction of the contraband (presumably, the obituary). (d/e 140-7, p. 5). Defendant Warden Walls concurred.[17] At some later point Plaintiff's writing privileges to his brother were restored.

Plaintiff contends that the confiscation of the obituary violated his First Amendment right to send outgoing mail and was done in retaliation for his grievances. Defendants offer no affidavits regarding this incident, nor do they sufficiently address the claims in their brief. Accordingly, these claims will remain in at this point.

However, Defendant Jennings was the one who wrote the alleged retaliatory ticket, not Defendants Korte or Lieutenant Ashcraft.

---

[17]Plaintiff's correspondence privileges with his brother had been revoked sometime prior to this incident and had been reinstated in November, 2007. (d/e 140-3, p. 26).

Summary judgment will be granted to Defendants Korte and Ashcraft because no evidence suggests that they were personally responsible for this alleged retaliation. Defendants Ashby, Davis, and Walls will remain as Defendants on this claim: they may bear personal involvement because they disciplined Plaintiff for sending the obituary.

Plaintiff also contends that Jennings and Ashcraft instructed Defendant Korte to write Plaintiff a false disciplinary ticket. (Plaintiff's Dep., p. 149). However, the Court is unable to find a ticket written by Korte in the response submitted by Plaintiff.[18]

## J. Defendant Barfield

Plaintiff alleges that Defendant Barfield refused to allow Plaintiff to receive his medicine on January 30, 2008, calling Plaintiff racially

---

[18]There is a 6/28/08 ticket written by an Officer Dewitt (not named as a defendant) accusing Plaintiff of refusing to cuff up, which Defendant Barfield signed to approve Plaintiff's confinement in temporary segregation. (d/e 140-14, p. 1). Committee members Ashby and Davis recommended two months of grade demotion, and Warden Walls concurred (d/e 140-13, p. 10). No evidence suggests that Dewitt was acting at the behest of anyone else. Plaintiff also offers his grievance against Vancil and Dewitt for their alleged mistreatment of him during a hunger strike, but this grievance is not relevant to any claims against the named Defendants. (d/e 140-9, p. 13).

derogatory names, in retaliation for a grievance Plaintiff had written against Nurse Thornton, Barfield's alleged girlfriend.[19] (Amended Complaint, p. 8, d/e 48). Plaintiff testified in his deposition that he was late to the medicine line on January 30, 2008 because his cell door was broken. The nurses refused to give Plaintiff his medicine because he was late, though through no fault of his own, and Barfield took the nurses' side.

Plaintiff offers no evidence that Defendant Barfield had any authority to override the nurses' refusal to dispense medicine. Defendant Barfield's purported decision not to speak out on Plaintiff's behalf does not amount to actionable retaliation. Nor does Plaintiff connect any grievances he filed against Thornton as possible motivators for Barfield's choice not to get involved. Summary judgment will therefore be granted to Defendant Barfield.

### K.  Defendant Smith

---

[19]Plaintiff avers in his affidavit that Defendant Barfield refused to allow Plaintiff to go to chow on some unspecified occasion, but this claim is not developed. (d/e 140, p. 10).

Defendant Smith allegedly deprived Plaintiff of a meal on February 16, 2008 because Plaintiff refused to close his own cell door on his way to chow. Plaintiff refused to close the door because "it's not my job and he can't force me to do his job, . . . ." (Plaintiff's Dep. p. 157).

Plaintiff's own testimony demonstrates that he has no retaliation claim against Defendant Smith. Plaintiff admits that the reason Smith did not take Plaintiff to chow was because Plaintiff refused to follow a direct order to close his cell door, not because of any protected First Amendment activity. Plaintiff argues that prison rules and regulations prohibit the withholding of meals as punishment, attaching an Illinois Court of Claims case which awarded an inmate $20 when a Lieutenant failed to take the inmate to chow because the inmate refused an order to store a typewriter. (d/e 140-2, pp. 41-45). State law violations are not federal law violations, and the Illinois Court of Claims has exclusive jurisdiction over state law tort claims against the State. Missing one meal does not arise to an objectively serious deprivation under Eighth Amendment standards. *See* Hudson v. Mc Millian, 503 U.S. 1, 9–10

(1992) ("Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' . . . , 'only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.'")(quoted cites omitted).  Summary judgment is therefore mandated for Defendant Smith.

### L.  Defendant Sweetin

Defendant Officer Sweetin allegedly joined in with the nurses on March 11, 2008 to force Plaintiff to wait hours to see the doctor. Sweetin allegedly called Plaintiff racial names and told Plaintiff that the white inmates would be taken to the doctor before Plaintiff.  Sweetin also allegedly told Plaintiff he was tired of Plaintiff's grievances against the nurses.  (Amended Complaint, p. 8, d/e 48).

However, like Defendant Barfield, Plaintiff has no evidence that Sweetin had the authority to override the nurses' decisions.  His refusal to speak up for Plaintiff is not actionable retaliation, and his unprofessional remarks are not actionable by themselves.  *See* <u>Antoine v.</u>

<u>Uchtman</u>, 275 Fed.App'x. 539 (7th Cir. 2008)(unpublished)(affirming dismissal for failure to state a claim regarding inmate's allegations that he was subjected to racist and threatening remarks in retaliation for his grievances).[20]  Accordingly, summary judgment will be granted in favor of Defendant Sweetin.

### M.  Defendants Wade, Tipton, and Holler

Plaintiff alleges in his Amended Complaint that on or about July 26, 2007 and other dates these Defendants threatened to "beat" him if he continued to file grievances.  They also allegedly denied Plaintiff access to his medication, ordered staff to interfere with Plaintiff's access to the chow line, and moved Plaintiff to a different cell in retaliation for his requests for his prescribed medicine.  Plaintiff testified in his

---

[20]<u>Antoine</u> is unpublished and therefore not precedential, but the case's reasoning is persuasive: "Antoine does not contend that the guards took any concrete action that dissuaded him from continuing to file grievances; indeed, his complaint and brief reveal that every time a guard made a statement that he deemed racist or threatening, he filed a fresh grievance against that guard. He has not been silenced, and the Constitution does not compel guards to address prisoners in a civil tone using polite language. Prisons may think it well to control guards' manner of speech, but that is for statutes and regulations (or perhaps the common law) rather than constitutional right."  275 Fed.App'x. at 541.

deposition that these Defendants also refused to let him go to yard on unspecified occasions and took other retaliatory actions like threatening to "jump" him and not allowing him to close his cell door. (Plaintiff's Dep. p. 165).

These claims are too vague and undeveloped to survive summary judgment. Plaintiff offers no evidence that these Defendants interfered with his medicine or chow line or moved him to a different cell, much less that they were motivated by retaliation for some unspecified First Amendment protected activity. Plaintiff's claim that these Defendants threatened to "beat" him if he did not stop filing grievances is also vague: When? Where? What were the circumstances? Further, without more this falls into the category of a mere verbal threat, not actionable under any constitutional theory for relief. *See* Antoine, *supra.* Accordingly, summary judgment will be granted in favor of these Defendants.

### N. Defendants Ashby and Davis

Defendants Ashby and Davis were on the Adjustment Committee which allegedly participated in the retaliation against Plaintiff for his

grievances. This retaliation allegedly took the form of placing Plaintiff in segregation on false charges, threatening Plaintiff with a transfer to Tamms Correctional Center, and condoning the retaliation of their fellow employees. (Amended Complaint, p. 9, d/e 48).

Ashby and Davis were involved in finding against Plaintiff on the ticket written by Defendant Cowick for threats and intimidation and on the ticket written for Plaintiff's attempt to send the obituary to his brother. According to Plaintiff, Defendant Ashby personally told him, "'Jones, stop writing up these officers or else.'" (Plaintiff's Dep. pp. 167).

The Court has already determined that Ashby and Davis will remain in on these claims regarding Plaintiff's discipline for purported protected First Amendment activities. *See supra.* Accordingly, summary judgment will be denied to Defendants Davis and Ashby.

### O. Defendants Gilson and Walls

Defendants Gilson and Walls were the Wardens during the relevant time. They allegedly implemented a policy prohibiting black inmates from attending chow hall with their hair in cornrows. They also allegedly

implemented or continued a policy of complete silence during movements (d/e 140-4, p. 13-14), as well as the policy against use of the library restroom. They allegedly approved of, directed, or turned a blind eye to the violations of the other IDOC Defendants. Plaintiff also appears to allege that some inmates were allowed multiple recreation times while others like him were denied recreation, apparently because of his race. He also alleges that these Defendants refused to allow him to clean his cell. (Amended Complaint, p. 9, d/e 48).

Plaintiff points to no evidence that white inmates were allowed more recreation time than black inmates. Nor does the inability to clean his cell arise to a constitutional violation, even if he did establish the personal responsibility of any Defendant, which he has not. And, requiring complete silence during line movements does not violate any constitutional right of which the Court is aware.

However, the Court does not have enough information about the hair style and the library restroom claims. Prohibiting black inmates from attending chow based on their hairstyles may implicate an equal

protection claim. As for the restroom policy, Defendants do not explain what the policy is or whether exemptions were granted based on medical needs. The Defendants accordingly remain in the case at this point.

## P.  Defendant Bolton

Defendant Bolton was the food supervisor at Western Illinois Correctional Center during the relevant time.  On March 15, 2007 Plaintiff received two potatoes on his food tray.  Defendant Bolton allegedly took away one of the potatoes with his bare hands because only one potato was allowed per inmate.  Plaintiff asked for another tray, telling Bolton that all the food on the tray was now unsanitary, but Bolton  refused to give him another tray.  (Amended Complaint, p. 10; Plaintiff's Dep. p. 171-73).  When Plaintiff continued to argue, Bolton called Defendants Pritchard[21] and Bradbury to the scene.  Pritchard and Bradbury then took Plaintiff back to his cell with no meal.  Id.  Plaintiff filed a grievance contending that the potato should not have been taken

_____

[21]Plaintiff avers that Defendant Pritchard and other Defendants are members of the Ku Klux Klan, but he has no evidence to support that speculation.  (d/e 140, p. 11).

and that he should not have been denied a meal.  (d/e 140-8, p. 19).

No juror could find that this indignity amounted to cruel and unusual punishment under the Eighth Amendment.  Having an extra potato removed from one's tray by bare hands simply does not rise to the level of an objectively serious deprivation.  Nor does any evidence suggest the potato was taken in retaliation for Plaintiff's exercise of his First Amendment rights or to discriminate against Plaintiff.  Defendants Pritchard and Bradbury did not violate the Constitution by removing Plaintiff from the cafeteria because he refused to follow orders.

### Q.  Defendants Pritchard and Bradbury

Plaintiff alleges in his Amended Complaint that Defendants Pritchard and Bradbury took Plaintiff's food, called him racial slurs, denied him his medication, and threatened to "beat" him if he continued to file grievances.  Defendant Pritchard also allegedly used excessive force by pushing Plaintiff into a steel bunk, causing a knot on Plaintiff's forehead and refusing Plaintiff medical attention for the injury. (Amended Complaint, p. 10, d/e 48).

Plaintiff clarified in his deposition that he is suing Pritchard and Bradbury in part over the potato incident. According to Plaintiff, these Defendants "dragged" Plaintiff out of the dining room after the potato incident and took him back to his cell with no meal. He feels that Pritchard and Bradbury should have investigated rather than taking Defendant Bolton's word about the potato. (Plaintiff's Dep. p. 175).[22]

Pritchard and Bradbury did not violate Plaintiff's constitutional rights by failing to investigate the potato incident. In any event, Plaintiff essentially admits that he disobeyed a direct order from Bolton to take the food tray he had already been given, less one potato. The First Amendment does not require prison guards to allow inmates to refuse direct orders or to argue with officers in a confrontational manner. Watkins v. Kasper, 599 F.3d 791, 798 (7th Cir. 2010)(confrontational approach inmate used to voice his grievance was not protected by First Amendment).

---

[22]Plaintiff filed a grievance against Fuqua and Pritchard on July 14, 2008 accusing them of using racial slurs and making threats (d/e 140-5, pp. 3-5). He also accused Pritchard of appearing as a Ku Klux Klan member on a Jerry Springer show (which has not been corroborated with any evidence). As discussed above, verbal harassment alone does not violate the Constitution.

Plaintiff also testified in his deposition that Defendant Bradbury failed to intervene on two or three occasions when the nurses refused to give Plaintiff his medications, instead directing Plaintiff back to his cell. (Plaintiff's Dep. p. 176).  However, no evidence suggests that Bradbury had the authority to direct the nurses to give Plaintiff his medicine, and there is no evidence that Bradbury had any reason to believe that the nurses' failure to dispense the medicine put Plaintiff at a substantial risk of serious harm.

The only possible claim may be one for excessive force against Defendant Pritchard.  The parties do not adequately address this claim, so it remains in for further development.[23]

### R.  Defendants Sievers and Hopke

Plaintiff alleges that Defendants Sievers and Hopke opened legal mail from his criminal defense lawyer on at least three occasions and tampered with his mail.  He alleges that they confiscated the obituary

---

[23]Plaintiff does not mention any excessive force in his grievance about the potato incident (d/e 140-8, pp. 19-20), but Defendants have not moved to dismiss based on exhaustion.

that he had tried to mail to his brother and turned the obituary over to Defendant Jennings of Internal Affairs. He also alleges that they gave Plaintiff's grievances to the employees named in those grievances. (Amended Complaint, p. 10, d/e 48).

Sievers and Hopke did not violate Plaintiff's constitutional rights by turning over the obituary to internal affairs for an investigation into whether the mail was gang related activity. Plaintiff's allegations that these Defendants published Plaintiff's grievances to employees named in those grievances is unsubstantiated. In any event, the Court cannot discern any constitutional violation from that action either.

Plaintiff's allegation that legal mail from his attorney was opened outside his presence is undeveloped. He does not provide a copy of the mail, so it is not possible to determine whether the mail qualified as confidential attorney-client communications. <u>Guarjardo-Palma v. Martinson</u>, 622 F.3d 801, 804 (7th Cir. 2010). However, summary judgment should not be granted on this claim without affidavit from these Defendants setting forth their policies and procedures for handling

legal mail and addressing Plaintiff's allegations that they opened his legal mail.

IT IS THEREFORE ORDERED:

a) The motion for summary judgment by the Medical Defendants is granted in part and denied in part (d/e 123). The motion is granted as to Defendants Dr. Brown, Nurse Buchanan, and Wexford Health Sources, Inc. At the close of this case, the clerk of the court is directed to enter judgment in favor of Defendants Dr. Brown, Nurse Buchanan, and Wexford Health Sources, Inc. The motion is denied as to Defendant Nurses Susette Ring, Candria Thornton, Rose Ashcraft, and Rhonda Hazelrigg on the following claims: 1) denial of medication on May 24, 2007 and January 30, 2008; and, 2) retaliation for Plaintiff's grievances.

b) The motion for summary judgment by the IDOC Defendants is granted in part and denied in part (d/e 120). The motion is granted as to Defendants Deborah Fuqua, Tara Goins, Jeffrey Barfield, R. Smith, Jeff Korte, Steve Ashcraft, Steve Sweetin, Brian Wade, Sergeant Holler, Haroleeta Patterson (a/k/a Tipton), Todd Bolton, and Matthew

Bradbury.  At the close of this case, the clerk of the court is directed to enter judgment in favor of said Defendants and against Plaintiff.  The motion is denied as to the following Defendants and claims:

       1) Claims against Defendants Olson, Hamilton, Skiles, Gilson, and Walls that barring Plaintiff from use of the library restroom constituted cruel and unusual punishment in light of Plaintiff's medical condition or effectively deprived Plaintiff of use of the law library due to his medical condition;

       2) Claim against Defendant Cowick for filing a disciplinary report against Plaintiff on March 28, 2007 in retaliation for his protected First Amendment activities;

       3) First Amendment retaliation and free speech claim against Defendants Ashby, Davis, and Walls for disciplining Plaintiff for statements in his grievance referred to by Defendant Cowick in her disciplinary report.

       4) Claim against Defendants Redshaw and Chute for refusing to allow Plaintiff to speak privately on the phone with his attorney;

       5) Equal protection claims against Defendants Sidwell and Cosgrove for pulling Plaintiff from the chow line on several occasions based on his race;

       6) Excessive force claim against Defendant Matt Brooks;

       7) First Amendment retaliation claim against Defendant Jennings for writing the disciplinary report for gang activity based on the obituary.

8) First Amendment correspondence claim against Defendants Ashby, Davis, and Walls for punishing Plaintiff for attempting to mail the obituary to his brother.

9) Equal protection claim against Defendants Walls and Gilson for alleged policy banning black inmates from attending meals with cornrows in their hair.

10) Excessive force claim against Defendant Pritchard;

11) Claims against Defendants Sievers and Hapke for opening Plaintiff's legal mail from his attorney;

c) The remaining Defendants are directed to file supplemental motions for summary judgment by May 31, 2012.

d) A final pretrial conference is scheduled for October 15, 2012 at 1:30 p.m. by telephone conference. The parties are directed to submit an agreed, proposed final pretrial order at least fourteen days before the final pretrial conference. Defendants bear the responsibility of preparing the proposed final pretrial order and mailing the proposed order to Plaintiff to allow Plaintiff sufficient time to review the order before the final pretrial conference. *See* CD-IL Local Rule 16.3.[24]

---

[24]The Local Rules are listed on this District's website: www.ilcd.uscourts.gov. A sample pretrial order is attached to those rules.

e)  The clerk is directed to issue a telephone writ to secure Plaintiff's appearance at the final pretrial conference.

f)  The proposed final pretrial order must include the names of all witnesses to be called at the trial and must indicate whether the witness will appear in person or by video conference.  Nonparty witnesses who are detained in the IDOC will testify by video.  Other nonparty witnesses may appear by video at the Court's discretion.  The proposed pretrial order must also include the names and addresses of any witnesses for whom trial subpoenas are sought.  The parties are responsible for timely obtaining and serving any necessary subpoenas, as well as providing the necessary witness and mileage fees.  Fed. R. Civ. P. 45.

g) Jury selection and the jury trial are scheduled on the Court's trailing trial calender for December 6, 2012 at 9:00 a.m..  A firm trial date will be chosen at the final pretrial conference.

h) After the final pretrial order is entered, the Clerk is directed to issue the appropriate process to secure the personal appearance of Plaintiff at the trial and the video appearances of the video witnesses at

the trial.

ENTERED:        April 19, 2012

FOR THE COURT:


                                        **s/Sue E. Myerscough**
                                   SUE E. MYERSCOUGH
                                   UNITED STATES DISTRICT JUDGE